Richard S. Busch (SBN 319881)
*richard.busch@arlaw.com*
Mark L. Block (SBN 115457)
*mark.block@arlaw.com*
Andrew H. "Drew" Davis (pro hac vice ~~forthcoming~~)
*drew.davis@arlaw.com*
David Niemierzycki (pro hac vice ~~forthcoming~~)
*david.niemierzycki@arlaw.com*
ADAMS & REESE, LLP
1600 West End Ave., Suite 1400
Nashville, TN 37203
Tel: (615) 259-1450
Fax: (615) 259-1470

Jeffrey E. Faucette (SBN 193066)
jeff@skaggsfaucette.com
Martin R. Glick (SBN 40187)
marty@skaggsfaucette.com
SKAGGS FAUCETTE LLP
505 Montgomery Street, 11th Floor
San Francisco, CA 94111
Tel: (415) 874-3181
Fax: (888) 980- 6547

*Attorneys for Plaintiff~~,~~ Gerencia 360 Music, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

~~SAN FRANCISCO DIVISION~~

GERENCIA 360 MUSIC, INC.,

Plaintiff,

v.

SUNO, INC.~~; BRIGHT DATA LTD.; and~~,
~~BRIGHT DATA, INC.,~~

~~Defendants~~Defendant.

Case Number: 3:26-cv-09248-RFL

**FIRST AMENDED COMPLAINT ~~AND~~FOR DIRECT COPYRIGHT INFRINGEMENT, CIRCUMVENTION OF PROTECTION MEASURES, AND REMOVAL OR ALTERATION OF CMI**
**DEMAND FOR JURY TRIAL**

Plaintiff Gerencia 360 Music, Inc. ("Gerencia") for its complaint against ~~Defendants,~~ Defendant Suno, Inc. ~~("Suno"), Bright Data Ltd., and Bright Data, Inc. (collectively, Bright Data, Ltd. and Bright Data, Inc. are referred to as "Bright Data") (collectively, Suno and Bright Data are referred to as~~ ("~~Defendants~~Suno" or "Defendant") alleges, on personal knowledge as to matters relating to itself, and on ~~information and~~ information and belief as to all other matters, as follows:

## I. NATURE OF THE CASE

1. Gerencia is an independent record label, music publisher, booking agency and management company which owns or controls, in whole and in part, the exclusive rights to hundreds of valuable musical compositions and master recordings pursuant to its contracts with songwriters, artists, and other rights holders. Gerencia specializes in Regional Mexican and Latin music, representing notable artists such as Adriel Favela, Cornelio Vega y Su Dinastia, and Noel Torres. It brings this action to enforce these exclusive rights against ~~the Defendants~~Defendant Suno, who ~~have~~has built ~~their~~its entire ~~business~~ business model ~~based~~ on copyright infringement at a scale ~~heretofore unseen~~never seen before. As explained below, Suno ~~(with assistance from Bright Data)~~ engaged in infringement of Gerencia's Spanish language ~~works~~Works so that it could quickly capture a significant share of the Spanish language AI user market.

2. Gerencia's catalog includes famous, evergreen hits in the Regional Mexican and Latin music genre, with over six billion streams between them including, inter alia, "Miami Vibe" performed by Codigo FN and Adriel Favela; "A Cuando Me Quede" performed by Givanny Ayala; and many more names and titles. Gerencia's catalog includes repeat Billboard performance, durable chart runs, multi-level RIAA certifications, RIAA awards, a Latin America Music Award, ASCAP and BMI recognition, and multiple SESAC Latina Performance Awards. A complete list of

those Musical Compositions and Sound Recordings at issue is attached hereto as Exhibits A and B (hereinafter, collectively the "Works"). The Works contains some of the most iconic Regional Mexican and Latin lyrics and melodies in music history. A list of further examples of the iconic Gerencia songs are identified below.

3. Suno, a Delaware Corporation with its principal place of business in Cambridge, ~~Mass.~~Massachusetts, with additional offices in New York, Los Angeles, and San Francisco, has admitted ~~to copying~~ to copying "essentially all music files of reasonable quality that are accessible on the open Internet" to train its

AI music generator—a dataset of tens of millions of songs/recordings that, given its scope, necessarily includes Gerencia's copyrighted ~~works~~Works. Indeed, ~~according to~~ publicly available sources, such *The*

~~3 like *The*~~ *Atlantic's* AI Watchdog (first published September 2025, expanded ~~in~~to music search tools in June ~~4 June~~ 2026), confirms that many of the Works appear in data sets known to be used by AI companies in the ~~5 in the~~ training of AI models. Publicly available sources also confirm that Suno accessed these ~~works~~Works from ~~6 from~~ licensed streaming services (~~like~~such as Spotify, YouTube, or SoundCloud) and paywalled platforms ~~(*e.g.*~~ (*e.g.* Tidal), as well as others, including Jamendo (www.jamendo.com), Free Music Archive (freemusicarchive.org), and MusicBrainz (musicbrainz.org), by scraping and circumventing ~~Tidal) by scraping and circumventing~~ technological access controls—in part through the use of tools and services supplied by ~~Defendant~~ Bright Data (as further defined below more specifically). Gerencia never authorized any Defendant to copy, ~~reproduce, or otherwise use its copyrighted works~~ ~~10~~ reproduce, or otherwise use the Works for AI training or any other purpose.

~~11~~ 4. Suno did so in a manner that completely disregards the rights of Gerencia ~~by making~~, and ~~12~~ constitutes copyright infringement, by making unlicensed copies of their Works, as well as server copies, removing Copyright Management Information ("CMI"), and training the AI models ~~Information ("CMI"), and training the AI models~~ themselves to ***disregard*** the CMI in both its training and output to conceal the infringement.

~~15~~ 5. Suno took these copyrighted musical ~~works~~Works and~~/or~~ the sound recordings embodying ~~them~~ ~~16~~ them and trained its AI model so that its users, which number over ten million, can create sound ~~recordings~~ ~~17~~ recordings based upon prompts. Suno operates on a "freemium" model allowing some free access, ~~but charges~~ ~~18~~ but charges users monthly subscription fees to fully use its platform, which produces AI-generated ~~music files~~ ~~19 designed~~music files intended to mimic human-made songs.

~~20~~ 6. Suno's users do not even have to write lyrics nor melodies. No, armed with the illicit ~~21~~ copies of millions of copyrighted works—including Gerencia's Works—Suno's AI model can create ~~an~~

22 an entire song, including the instrumentals, vocals, and entirely generated lyrics, all thanks to the training 23 training on these unlicensed copies of the works in its library. That is, Suno made illicit copies of millions of 24 millions of copyrighted musical works, including Gerencia's Works, and then, without any remuneration to the rights holders created a platform where anyone capable of paying $10 per month to create entire songs based entirely on these illicit copies. This is not speculation,. Suno's Founder and CEO, Mikey Shulman gave an interview admitting,: "One of the biggest challenges in modeling music is just that a three-minutethree minute song has so many data points in it that it is really difficult for models to accurately capture all of the interesting stuff there. Our models are taught to just continue a piece of music. And with that, and a little bit of extra sauce for getting these things to start properly, we can go from an idea in somebody's head, to an entire three minute song very easily."[1] [1] That is, while Suno advertises itself as a completely generative AI music creation service that generates songs from whole cloth, ***its own CEO*** admits that it has just trained its models to "continue a piece of music"—that is, the music 6 a piece of music"—that is, the music that Suno and its agent, Bright Data, illegally scraped and copied to train its Model in blatant disregard 7 todisregard of the rights of the copyright holders allows Suno to create unlicensed derivative works thereof. thereof. Without the unlawful copying of Gerencia's Works and ingestion into its AI models, Suno's service would be incapable of producing the product/service that has been used by more than 100 million people and netted it over 2 million paid subscribers.[2]

8 7. Gerencia's Works are especially important to Suno because they are hugely popular

Spanish language works, which Suno has misappropriated to train its models so they may provide Spanish language songs in response to user queries. Without its infringement of Gerencia's Spanish language copyrighted Works, Suno would not have been well-positioned to capture a significant share of the Spanish language AI user market.

8. Suno has materially enjoyed the fruits of others' labor closing its Series D in June 2026, raising over $400 million at a $5.4 ***billion*** valuation.~~2~~[3] Indeed, Suno's business is generating hundreds of millions of dollars annually with projected revenue to reach $1 billion by 2028.[4]

9. Mr. Shulman's motivations are clear. Because, per Mr. Shulman, "[i]t's not really enjoyable to make music now,"[5] he decided to cut out human creation from the process. Mr. Shulman explained "[w]e didn't just want to build a company that makes the current crop of creators 10 percent faster or makes it 10 percent easier to make music. If you want to impact the way a billion people

~~9. Defendant Bright Data Ltd. is an Israeli company with its principal offices in Netanya, Israel. Upon information and belief, Bright Data Ltd. does business in the United States through its wholly-owned subsidiary, Bright Data, Inc. (collectively "Bright Data") provides data-scraping, proxy-network, and dataset services sold to customers including AI developers, including, as relevant here for Suno. Bright Data develops, markets, and sells web-scraping infrastructure, residential and datacenter proxy networks, and pre-packaged datasets to business customers worldwide, including companies in this District and throughout the United States. Upon information and belief, Bright Data maintains offices and/or employs personnel in the United States, transacts continuous and systematic business in the United States, and has purposefully directed its scraping tools and services at copyrighted content hosted on U.S.-based platforms.~~

~~1~~[1] "Suno Generates Beautiful Songs with Oracle Cloud". ~~www.youtube.com/watch?v=aKlIQiS8MLc~~www.youtube.com/watch?v=aKlIQiS8MLc

~~2~~[2] https://www.forbes.com/sites/conormurray/2026/02/26/ai-music-platform-suno-reaches-2-million-subscribers-as-industry-backlash-grows/

[3] Stassen, Murray, "Suno Raises Over $400 Million, Pushing Valuation to $5.4 Billion." Music Business Worldwide, <www.musicbusinessworldwide.com/ suno-raises-over-400-million-pushing-valuation-to-5-4-billion/> (last visited July 30, 2026).

[4] Kristin Robinson, Is Suno the Music Industry's Biggest Nightmare – Or Greatest Hope?, Billboard (Mar. 11, 2026) (available at https://www.billboard.com/pro/suno-ai-music-startup-cover-story/) (last visited Oct. 18, 2026).

[5] 20VC Podcast with Harry Stebbings, *Mikey Shulman, CEO @Suno: The Future of Music, What is*

*Gonna Happen?* at 23:01-23:16 (Jan. 10, 2025).

10. Bright Data claims to be establishing the "standard for Ethical Web Data Collection."[3] experience music you have to build something for a billion people."[6] Said another way, Suno was

2 Indeed, in lawsuits against X (formerly Twitter) and Meta, Bright Data assured this Court previously

3 that its suite of technologies are used only "to synthesize vast amounts of public data." *See X Corp.*

4 *v. Bright Data Ltd.*, 733 F. Supp. 3d 832, 839 (N.D. Cal. 2024) (finding no breach of X's Terms of

never meant to be a tool for artists to create music but was instead always meant to replace the artists whose works were being unlawfully copied by directly reaching those artists' listeners with AI-generated substitutes which copy the originals.

10. Suno's investors knew from the beginning that they were funding a massive vehicle for copyright infringement with one investor calling the risk that labels and publishers would sue as just "the risk we had to underwrite when we invested in the company, because we're the fat wallet that will get sued right behind these guys… Honestly, if we had deals with the labels when this company got started, I probably wouldn't have invested in it. I think that they needed to make this product without the constraints."[7]

11. And, when the labels and publishers did, in fact, file suit, Suno agreed to settle with Warner Music Group to use its sound recordings as training data for generative AI models. Suno agreed to "deprecate[]"[8] its then-current models and launch the now-operable V6. Mr. Shulman commented on the settlement, "I don't think of what we did as a settlement. I think about this much more like a partnership ........It is much more long term."[9] Suno also reached an agreement with BMG. In a public statement Mr. Shulman made an about-face, no longer seeing partnerships with rightsholders as "constraints" but as a partnership that would "generate new revenue" for artists and songwriters, claiming to believe in "responsibly [] working directly with the people who make music and the companies that represent them."[10] Likewise, Suno has reached an agreement for a "strategic partnership" with Believe, a leading digital music company, for it to provide its music as training data

[6] *Id.*

[7] Brian Hiatt, *A ChatGPT for Music is Here. Inside Suno, the Startup Changing Everything*, Rolling Stone (Mar. 17, 2024) (available at https://www.rollingstone.com/music/music-features/suno-ai-chatgpt-for-music-1234982307/ (last visited Oct. 18, 2026)).

[8] Press Release, Warner Music Group, *Warner Music Group and Suno Forge Groundbreaking Partnership* (Nov. 25, 2025) (available at https://www.wmg.com/news/warner-music-group-and-suno-forge-groundbreaking-partnership (last visited Oct. 18, 2026)).

[9] Kristin Robinson, *Is Suno the Music Industry's Biggest Nightmare – Or Greatest Hope?*, Billboard (Mar. 11, 2026).

[10] Press Release, BMG, BMG and Suno Announce Global Strategic Alliance Advancing AI Music Opportunities And Revenue Streams (Aug. 12, 2026) (available at https://www.bmg.com/news/bmg-and-suno-announce-global-strategic-alliance-advancing-ai-music-opportunities-and-revenue-streams (last visited Oct. 18, 2026)).

for Suno's models.[11] That is, now that it faces numerous lawsuits and challenges from rightsholders, Suno has all but admitted that there is a functioning market for licensing music and sound recordings for training data, that such licenses are part of "responsibly" creating AI models, and essentially admitting to the unlawfulness of its conduct for all the music used to train its models that remains unlicensed—including Gerencia's Works. Suno's business model was admittedly and clearly: infringe now, make billions by being the first mover, and try to settle on the cheap later. Seeking forgiveness is clearly more profitable than permission, which they obviously could have done but consciously chose not to do.

12. The reason for this about face and sudden willingness to license is no surprise. Suno has lost every step of the way. Its motions to dismiss in other cases have been denied, and, on July 31, 2026, the Munich Regional Court in Germany ruled in a suit brought against Suno by Germany's music collecting society, GEMA, for identical conduct to that at issue in this case, that Suno infringed GEMA's copyrights by training its models on GEMA's songs in the U.S (of which it stored entire works inside its models), and by reproducing them. Judge Elke Schwager noted that it was undisputed that Suno obtained the training data through stream-ripping, and Suno admitted it trained on GEMA's works without paying for them. Most importantly, the court ruled that Suno needed a license to GEMA's works under U.S. copyright law, *i.e.* where the training physically happened. And finally, it granted GEMA an injunction and issued a disclosure order requiring Suno to disclose its revenue tied to the infringed works.[12]

13. All irony lost, Mr. Shulman remarked about another pending lawsuit against Suno,

[11] Press Release, Believe and Suno Announce Strategic Partnership to Advance Licensed AI Music Opportunities for Independent Artists and Labels, Believe (Sept. 8, 2026) (available at https://www.believe.com/press-release/believe-and-suno-announce-strategic-partnership/ (last visited Oct. 18, 2026)).

[12] Virginie Berger, *Suno Loses Copyright Lawsuit To GEMA—AI Music Companies Should Worry*, Forbes (Aug. 5, 2026), https://www.forbes.com/sites/virginieberger/2026/08/05/suno-lost-to-gema-why-the-ruling-should-worry-ai-music-companies/ (also noting the suit filed by Koda, Denmark's music collecting society, against Suno over the same conduct). Further, the Society of Composers,

Authors, and Music Publishers of Canada (SOCAN) filed suit in the Federal Court of Canada against Suno on September 2, 2026 for the same conduct. https://www.socan.com/socan-is-standing-up-for-music-creators-and-publishers-with-legal-action-against-suno-inc-for-unauthorized-use-of-music-in-generative-ai-platform/.

"[i]t just seems silly to throw a bunch of venture dollars at lawyers instead of sitting down and talking about how you could work together."[13] However, at no point prior to launching any of its AI models did Suno "sit down" with anyone from Gerencia, and this statement is belied by the investor statements, discussed *ante*, that prior to getting caught with their proverbial hands in the cookie jar, Suno felt that it didn't need the "constraints" of license agreements with the rightsholders. That is, Suno willfully infringed on millions of copyrights – including all of the Gerencia Works in this case.

5 Service for scraping data therefrom); *Meta Platforms, Inc. v.* 14. Bright Data Ltd., 2024 WL 251406with its wholly-owned subsidiary, Bright Data, Inc. (collectively,

6 (N.D. Cal. Jan. 23, 2024) (same, no breach of Meta's Terms of Service). However, the aggregation

7 of non-copyrighted public information is vastly different than the creation of millions of unlicensed

"Bright Data") provides data-scraping, proxy-network, and dataset services sold to customers including AI developers, including, as relevant here, for Suno. Bright Data develops, markets, and sells web-scraping infrastructure, residential and datacenter proxy networks, and pre-packaged 8 copies of songs/masters in playable format and copyrighted lyrics to songsdatasets to business customers worldwide. Publicly available sources show that according to leaked 9 show thatsource code from Suno, usingit used proxy services it acquired from Bright Data, and scraped "millions of songs and

10 songs and lyrics" from YouTube Music, Deezer, and Genius.[4][14] In this leaked source code, there is a YouTube Music workflow that shows 2,057,486 artist records saved as output. For each artist, the code requests the artist's song playlist without a track limit. If there is no playlist identifier, it falls back to the song results already available. This shows a systematic effort to collect across artists' catalogs. Further, a separate Genius workflow records 6,980,653 successful song-page processing records confirming that not less than this number of extracted lyrics exist in Suno's code.

15. For example, publicly available sources have confirmed that Suno used Bright Data's services to scrape and incorporate into its training data files like "youtube_music" which includes over two million music clips of approximately 113,879 hours—the equivalent of thirteen ***years***—of music files scraped from YouTube.[15]

///

[13] Stuart Dredge, Suno Boss Targets 'Bigger, Brighter Future' With Music Industry, Music Ally (Jan. 14, 2025) (available at https://musically.com/2025/01/14/suno-boss-targets-bigger-brighter-

11. That is, Bright Data provided services to Suno which are only good for copyright infringement – namely the making of unlicensed copies of songs and lyrics – including Gerencia's Works – from licensed sources like YouTube, Deezer, and Genius. Indeed, Bright Data even advertises that its suite of products can use "puppets" to mimic human interface with websites and get around CAPTCHAs[5] and other blockers used to prevent this kind of data scraping, claiming it can provide "One API call. Any website. Zero blocks."[6] Bright Data's advertising admits that its services create unlicensed copies. It advertises that its services can create copies of "Separated audio tracks in m4a [file format], aligned to video timestamps. Ideal for ASR [Automatic Speech Recognition], audio-language models and multimodal training that needs the audio signal preserved."[7]

12. While ironically calling these tools "100% ethical and compliant"[8] Bright Data is 22

[3] *See* Bright Data's Trust Center: Leading Ethical Web Data Collection, <www.brightdata.com/trustcenter>future-with-music-industry/ (last visited July 30Oct. 18, 2026)).

24 [4][14] Koebler, Jason, "Hack Reveals Suno AI Music Generator Scraped YouTube, Deezer, and Genius," 404 Media, <www.404media.co/hack-reveals-suno-ai-music-generator-scraped-youtube-deezer-and-

25 genius/> (last visited July 30, 2026)

[5] The "Completely Automated Public Turing test to tell Computers and Humans Apart" or CAPTCHA is a security test used by websites to determine whether a visitor is a human or a computer program (a 'bot').

[6] <www.brightdata.com/products/web-unlocker> (last visited July 30, 2026)

[7] <www.brightdata.com/ai/video-data> (last visited July 30, 2026)

[8][15] *Id.*

admitting that its services can be used to make copies of any song or video from the internet regardless of whether Bright Data or its users have a license to create said copies. Worse, publicly available sources have now confirmed that Suno used Bright Data's services to do just that. Public sources have identified files from Suno's training libraries include files like "youtube_music" which includes over two million music clips of approximately 113,879 hours – the equivalent of thirteen *years* – of music files scraped from YouTube.[9]

13. Bright Data's tools are specifically designed to scrape music files *en masse* and strip them of CMI and otherwise prepare them to train AI Models. These tools not only violate the Digital Millennium Copyright Act's anti-circumvention and anti-removal of CMI provisions, but also render

~~Bright Data contributorily liable for Suno's copyright infringement.~~

~~14. Like the other Defendants, Bright Data has created enormous revenue by selling its tools to copyright infringers, enjoying 50% year-on-year revenue growth, surpassing $300 million in revenue in 2025 with a projected Annual Recurring Revenue projection of $400 million in 2026.[10]~~

## II. THE PARTIES

~~15~~16. Plaintiff Gerencia 360 Music, Inc. is a California corporation with its principal place of business in Burbank, California. Gerencia is a leading independent music company specializing in Regional Mexican and Latin music that owns or exclusively controls copyrights (publisher share, writer share, and/or administration rights) in hundreds of musical compositions and master recordings. Gerencia's catalog includes iconic, chart-topping Mexican Regional and Latin songs written and performed by some of the top legendary artists and songwriters in this genre.

~~16~~17. Each Work listed in Exhibits A and B constitutes an original work ~~or~~of copyrightable subject matter under the Copyright Act, 17 U.S.C. ~~§~~section 101, et seq~~.~~. Each Work on Exhibit A has been registered with the U.S. Copyright Office prior to the infringement by ~~Defendants~~Defendant as evidenced by the registration numbers listed therein. Each Work on Exhibit B is entirely owned or controlled by Gerencia, and while the Exhibit B Works have not been registered with the U.S. Copyright Office, they have all been affixed in a tangible medium and therefore afforded copyright protections pursuant to 17 U.S.C. ~~§~~section 102. The copyrights for each of the Works in Exhibits A and B remain valid and subsisting~~,~~ and have been owned and/or controlled by Gerencia, in whole or in part, at all times relevant to the allegations in this Complaint.

~~17~~18. Defendant Suno, Inc. is a Delaware corporation with its principal place of business at 17 Dunster Street, Cambridge, Massachusetts 02138. Suno develops, operates, and sells a generative AI music service that creates digital music based on user prompts. Suno charges users monthly subscription fees to use its platform, which produces AI-generated music files designed to mimic

~~[9] *See* note 4, *supra*.~~

~~[10] "Bright Data reaches $300m ARR amidst demand for web data" Asymmetrix. <www.asymmetrixintelligence.substack.com/p/bright-data-reaches-300m-arr-amidst> (last visited July 30, 2026)~~

9 human-made songs.

18. Defendant Bright Data Ltd. is an Israeli company with its principal offices in Netanya, Israel, doing business in the United States through its data-scraping, proxy-network, and dataset services sold to customers including AI developers. Bright Data develops, markets, and sells web-scraping infrastructure, residential and datacenter proxy networks, and pre-packaged datasets to business customers worldwide, including companies in this District and throughout the United States. Upon information and belief, Bright Data maintains offices and/or employs personnel in the United States, transacts continuous and systematic business in the United States, and has purposefully directed its scraping tools and services at copyrighted content hosted on U.S.-based platforms.

19. Defendant Bright Data Inc., is a Delaware corporation with offices in Manhattan, New York, NY and in San Francisco, CA. Upon information and belief, Bright Data, Inc. is a wholly-owned subsidiary of Bright Data Ltd. through which Bright Data Ltd. conducts business in the United States.

## III. JURISDICTION AND VENUE

2019. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§sections 1331 (federal question) and 1338(a) (copyright actions) because the claims alleged herein arise under the Copyright Act of 1976, 17 U.S.C. §§sections 101 *et seq.*, including the Digital Millennium Copyright Act, 17 U.S.C.

sections §§ 1201-1205.

2120. This Court has personal jurisdiction over Defendant Suno because Suno has transacted business in this District, including offering and selling its AI music generation service to customers in California via the Internet; because Suno's infringing conduct has been directed at and caused harm in this District; because the infringing conduct occurred in this District given Suno's use of Oracle Servers physically located in this District; because, on information and belief, it operates its business out of its offices located in this District; and because the exercise of personal jurisdiction over Suno comports with due process. Suno operates its business out of offices in Cambridge, Mass., New York, Los Angeles, and, more recently San Francisco. It has been reported that Suno opened its San Francisco office in late March 2026 in SoMa ("South of Market" area). S. Chen, *AI music generator Suno opens SF office* (April 3, 2026). According to that report, Suno's co-founder/CTO Georg

Kucsko told Axios (via email) that opening doors in San Francisco "will be critical as we continue to scale" and that the company is "investing especially heavily in our machine learning team to develop our frontier music model").[11][16] Since that time, Suno has been actively recruiting employees to work in its San ~~Francisco~~Franciso office. *See* E. Tanaka, "AI Song Factory Suno Sneaks Into SoMa as San Francisco Tech Beat Kicks Back In," *Hoodline* (April 3, 2026) (noting at that time, "Local job listings point to an active recruitment drive for engineers, product designers and machine learning researchers based in San Francisco").[12][17] According to that report, many of the roles offered on Indeed "list San Francisco as the required location and note that some positions will be on site." *Id.* As of August 2026, job openings on Indeed include Lead Machine Learning Data Operations, Senior Director of Customer Experience, Senior Corporate Recruiter, Senior Counsel, Director of Accounting, and others.[13][18] In addition, Suno uses Oracle servers "to train its proprietary machine learning models and support growing demand for its next generation of generative music models." Oracle, *AI Innovators Flock to Oracle to Address Some of the World's Most Pressing Challenges* (March 18, 2024). According to publicly available sources, Oracle's servers are located in Virginia, Illinois, Phoenix, San Jose, CA (Northern District), as well as Mexico and Canada. According to other public sources, each of ~~Suno's~~Sonos five fundraising rounds were pitched to and lead by venture capital firms located in the Northern

~~11~~ 16 https://www.axios.com/local/san-francisco/2026/04/03/suno-ai-music-generator-startup-office-expansion.

~~12~~17 https://hoodline.com/2026/04/ai-song-factory-suno-sneaks-into-soma-as-san-francisco-tech-beat-kicks-back-in/

~~13~~18 https://www.indeed.com/q-suno-l-san-francisco%2C-ca-jobs.html?vjk=34349af3bb314a9a

District—Seed round (Matrix Ventures, Cambridge/San Francisco) Series A round (Matrix Ventures, Cambridge/San Francisco), B round (Lightspeed Ventures, Menlo Park), C round (Menlo Ventures, Menlo Park), and D round (Bond Capital, San Francisco). ~~Furthermore, this Court may exercise jurisdiction over Suno through the suit-related contacts with this state of Suno's agent, Bright Data, whose services were used to create the infringing copies, and as discussed herein, Bright Data has already been adjudicated to have sufficient contacts with California and the District for personal jurisdiction over it, as discussed below.~~

~~22. This Court has personal jurisdiction over Defendant Bright Data Ltd. and Bright Data,~~

Inc. because Bright Data (collectively) has transacted business in this District, including selling its web-scraping tools, proxy-network services, and datasets to customers in California and throughout the United States, including AI developers in this District; because Bright Data has purposefully directed its commercial activities toward the forum; and because the exercise of personal jurisdiction over Bright Data comports with due process. Indeed, this Court has previously denied Bright Data Ltd.'s motion to dismiss for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2), finding, "Bright Data had sufficient contacts with California and the district." *X Corp. v. Bright Data Ltd.*, 733 F. Supp. 3d 832, 841 (N.D. Cal. 2024); *see also X Corp. v. Bright Data Ltd.*, No. C 23-03698 WHA, 2024 WL 422075, at *2 (N.D. Cal. Feb. 5, 2024) ("There is no question that Bright Data has sufficient contacts with California and this district such that these claims should proceed in this district court. Bright Data is hardly the non-resident defendant that specific personal jurisdiction aspires to insulate."). Bright Data, Inc. is also properly subject to this Court's jurisdiction given it maintains an office within the District and has engaged in suit-related conduct in the district.

22 2321. Venue is proper in this District under 28 U.S.C. §§sections 1391(b) and/or 1400 because Defendant Suno maintains an office in this District to, among other things, manage the training of its AI Models and the data servers on which they operate, and uses data servers located in the District through Oracle Cloud Infrastructure for that purpose – which includes hosting the illicit copies of Gerencia's Works on these servers. Furthermore, venue is proper in this District given Suno's contacts with the District through its agent, Bright Data, whose services it used to create the infringing copies, and given this Court has already found jurisdiction and venue proper in suits regarding similar conduct by Bright Data, as discussed herein.

24. Venue is proper in this District under 28 U.S.C. §§ 1391(b) and/or 1400 because Defendant Bright Data maintains offices in the District, and its suit-related conduct occurred within the District. Indeed, as this Court previously noted, "Bright Data has directed potential customers interested in the data, tools, and services at issue to a sales office in downtown San Francisco as recently as October 2022; has located many members of its business development and sales team in the Bay Area, including its Chief Revenue Officer and Global Head of Presales; and has advertised and sold California IP address proxies that allow customers to '[o]vercome all blocks all of the time in California.'" *X Corp.*, 2024 WL 422075, at *2.

## IV. Divisional Assignment

~~25~~22. Pursuant to the Court's Assignment Plan (General Order No. 44), this action is an intellectual property action within the meaning of Local Rule 3-2(c) and therefore is not subject to intradistrict venue provisions.

## V. Factual Background

### A. Gerencia and Its Copyrights

~~26~~23. Gerencia is a leading independent music company that owns or exclusively controls copyrights in hundreds of musical compositions and master recordings in the Regional Mexican and Latin genre. Gerencia's catalog includes works by some of the most celebrated Regional Mexican and Latin songwriters and recording artists.

~~27~~24. Gerencia knows that great music starts with great songwriting and masterful lyricists, and is committed to supporting and protecting the creative works its songwriters have entrusted to it. As a publisher and record label, Gerencia regularly enters into licenses and other agreements for the works it owns, through which Gerencia compensates its songwriters for their share of earnings. Gerencia's songwriters rely on the income received from these transactions to support their livelihood and art. This system of licensing, permissions, and authorized use is the backbone of the music publishing industry~~,~~ and ensures that the songwriters and publishers who have invested their blood, sweat, tears, heartache, elation, and experience into their creative works receive compensation for the use of those works.

~~28~~25. U.S. copyright law simply does not let technology platforms like Suno ride roughshod over these ~~Constitutionally-mandated~~Constitutionally mandated protections of creative expression. Indeed, copyright owners necessarily have the right to police the use of their copyrighted works. "The owner of the copyright, if he pleases, may refrain from vending or licensing and content himself with simply exercising the right to exclude others from using his property." *Fox Film Corp. v. Doyal*, 286 U.S. 123, 127 (1932); *see also Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966, 997 (C.D. Cal. 2006) ("The right to exclude is inherent in the grant of a copyright; a copyright is not improperly expanded simply because the owner has exercised his or her power to exclude."). These are age-old,

hornbook copyright principles. ~~Defendants~~Defendant simply ignored them.

~~29~~26. Gerencia, its songwriters, and its artists, rely on U.S. copyright law to protect their works from infringement. Without such protections, the music publishing industry would not function because songwriters and artists would be unable to profit from their work, and because publishers and record companies like Gerencia would lack the financial ability and incentive to invest in the careers and promote the works of their songwriters/artists.

~~30~~27. Gerencia generates revenue from its catalog by licensing compositions for use in recordings, live performances, synchronization placements, mechanical reproductions, print, digital transmissions, and streaming. The value of these licensing activities depends entirely on Gerencia's ability to enforce its exclusive right to authorize—or decline to authorize—the reproduction, distribution, and public performance of its copyrighted ~~works. Defendants'~~Works. Defendant's conduct directly undermines and dilutes that exclusivity.

~~31~~28. One way Gerencia exploits its copyrights is to grant licenses ~~to~~for the display of the copyrighted lyrics of its works to ~~an~~ aggregator ~~website~~websites, such as Musixmatch. These licenses require ~~the licensees to~~ that the licensee provide the corresponding song title, songwriter(s), and other identifying information ~~for the Works~~ ~~—~~for the Works—*i.e.* the CMI. The display of the CMI is essential for informing consumers about the ~~authors of~~ authors of musical works, ensuring credit is given to creators, maintaining copyright protections, ***and*** ~~to direct~~ to direct other putative licensees to Gerencia. Any removal or alteration of CMI by unlicensed parties ~~violates~~ violates these rights and harms the interests of Gerencia and its songwriters. It also violates the ~~Copyright~~ law~~Act~~.

~~32~~29. Gerencia's catalog includes some of the most recognizable and commercially valuable songs in the history of Regional Mexican and Latin music. A list of Gerencia's copyrighted musical compositions and sound recordings that ~~Defendants have~~Defendant has infringed is set forth in Exhibit A, attached

hereto and incorporated by reference. A list of Gerencia's copyrighted musical compositions and sound recordings for which ~~Defendants have~~Defendant has removed and/or circumvented CMI is set forth in Exhibit B, attached hereto and incorporated by reference.

### B. Suno's Infringing Conduct

#### (i) Suno unlawfully scraped data from the internet, including Gerencia's Works.

~~33~~30. Suno operates a subscription-based generative AI platform that generates new songs and audio recordings in response to user text prompts. Suno became widely available starting with version 3 on March 24, 2024, with the current version 5.5 launched in March 2026.

~~34~~31. Suno's AI model was trained on a corpus of recorded music that, by Suno's own admission in separate litigation, encompasses substantially all available commercial recordings of adequate fidelity. In its answer to the complaint in *UMG Recordings, Inc. v. Suno, Inc.*, No. 1:24-cv-11611-FDS (D. Mass.), Suno stated that its "training data includes essentially all music files of reasonable quality that are accessible on the open Internet, abiding by paywalls, password protections, and the like."

~~35~~32. Gerencia's Works are among the most widely distributed works in the Regional Mexican and Latin musical genre on licensed streaming services. Given Suno's self-described training methodology—which involved harvesting effectively all available recordings—it is ~~very~~a near ~~likely~~certainty that Gerencia's Works were copied into Suno's training sets. Gerencia's works are available on Spotify, Apple Music, YouTube, Amazon Music, SoundCloud, and Tidal, among others, all of which are duly licensed with Gerencia and require some form of account registration, subscription, or other access credential to use.

~~36~~33. Upon information and belief, Suno obtained copies of Gerencia's ~~copyrighted works~~Works by accessing ~~by accessing~~ these platforms – including specifically YouTube and Deezer – through automated scraping tools that bypassed login requirements, subscription gates, and technical anti-bot defenses~~,~~ in part through

tools and proxy services supplied by Defendant Bright Data. Suno then ingested these unauthorized copies into its training pipeline, producing an AI model capable of generating audio that closely imitates the style, structure, and expressive character of the copyrighted recordings on which it was trained.

34. Specifically, with respect to its scraping of YouTube music, Suno illicitly used a notorious method of music piracy known as "stream ripping" to download millions of songs. While YouTube allows users to stream content (playing it as received), it is not designed to allow and instead prohibits making permanent, unrestricted copies of the content it streams. In this regard, YouTube's Terms of Service generally prohibit the unauthorized use of recordings available on its platform.

35. Moreover, YouTube employs enhanced technological measures to protect against unauthorized downloading and copying of licensed content, including Gerencia's Works. Specifically, YouTube employs a "rolling cipher" encryption measure to control access to such content, preventing external sites or services from directly downloading protected media files. YouTube maintains two different URLs for any given video: the page URL, visible to the user, is for the webpage where the video playback occurs, and the file URL, not visible to the user, is for the video file itself that is played within the page. The file URL is encrypted using a complex and periodically changing algorithm (the "rolling cipher") that is designed to impede external access to the underlying YouTube video files, thereby preventing or inhibiting any downloading, copying, or distribution of the videos. Upon information and belief, the video player on the page URL must decrypt or descramble the file URL to locate and play the underlying audiovisual file.

36. Although YouTube revises the rolling cipher by design, there are illicit tools and services that circumvent the encryption, download audiovisual content available on YouTube, and create copies that can be downloaded and further distributed by users without restriction. This process is commonly known as scraping or "stream ripping."

37. Upon information and belief, Suno used such stream ripping tools – specifically, tools known as YT-DL, and YT-DLP, to circumvent YouTube's encryption and scrape copyrighted recordings from YouTube. This stream-ripping is the key means by which Suno engages in its first infringing act of reproducing Gerencia's Works.

38. Suno's scraping was made public on or about September 2, 2025, after the ICMP shared evidence with Billboard, in particular private datasets that demonstrate the illegal scraping of copyrighted sound recordings from YouTube by Suno. Suno's scraping of the Internet and ingestion of this content violates the Copyright Act and constitutes infringement of Gerencia's Works.

**(ii) Suno utilized Bright Data's technology products to assist in its scraping of copyrighted materials from the internet and to remove CMI from these materials.**

39. Bright Data is a commercial vendor of web-scraping infrastructure whose business model is built on enabling customers to extract data from websites at scale—including websites that employ technical measures to prevent exactly that kind of bulk automated extraction. Bright Data's product suite includes residential and datacenter proxy networks that rotate IP addresses to evade rate limits and IP bans; a "Web Unlocker" service designed to defeat CAPTCHAs, JavaScript challenges, and bot-detection systems; and a "Scraping Browser" that renders pages in a browser environment without the headers and footers to circumvent client-side protections.

40. As discussed above, CMI regularly exists in the headers and footers of files containing musical works. Making the deliberate choice to exclude headers and footers is identical to making the deliberate choice to remove CMI from these files. Suno thus extracted musical recordings from various above-alleged sources on the Internet, and extracted the CMI from the entirety of these files, which includes the CMI attributable to Gerencia's Works.

41. Upon information and belief, Bright Data's tools and services were used by Suno to extract Gerencia's Works from licensed streaming and lyrics platforms. This extraction required circumventing the technological protection measures those platforms employ: authentication gates, subscription paywalls, rate limiting, CAPTCHA challenges, and robots.txt access restrictions, as well as removal of CMI.

**(iii) Suno's Outputs also constitute copyright infringement of Gerencia's Works.**

3 3742. As discussed above, Suno's Founder and CEO, Mikey Shulman admitted that the 4 model faces "challenges in modeling music" and "[O]urour models are taught to just continue a piece of 5 music."[14][19]

[19] "Suno Generates Beautiful Songs with Oracle Cloud". www.youtube.com/watch?v=aKlIQiS8MLc

43. Many outside observers drew the obvious conclusion that Suno's model, however, was clearly trained on copyrighted music, a few examples are:

- "Though neither company will directly confirm or deny it, there is substantial reason to believe that . . . Suno . . . w[as] trained on copyrighted music, without permission[.]" Brian Hiatt, *AI-Music Arms Race: Meet Udio, the Other ChatGPT for Music*, Rolling Stone (Apr. 10, 2024).
- "While details about the data that trained these AI tools are spare, there is plenty of reason to believe that they are trained on copyrighted music." Sharon Goldman, *AI Music May be Having a Moment, But Human Songwriters Would Like a Word*, Fortune (May 17, 2024).
- "Although Suno hasn't revealed what music has been used to train its music-generation models, it seems almost certain that the startup has used materials without the explicit consent of their creators. For one thing, many of its musical outputs are somewhat similar to popular songs." Mike Wheatley, *Generative AI Music Maker Startup Suno Raises $125M in Funding*, SiliconAngle (May 21, 2024).
- "To create music as convincing as some of the examples generated by Suno and other platforms using AI algorithms means training those algorithms on existing music, and lots of it. And that's where copyright comes into play, because it's become plainly obvious that many AI models have been built by ingesting enormous quantities of copyrighted material." Daniel Tencer, *Suno Could Get Sued By The Record Business. Who's Backing it With $125M?*, Music Business Worldwide (May 28, 2024).

~~6 38~~44. Suno never sought or obtained a license from Gerencia to reproduce, copy, or train on ~~7~~ any particular composition or sound recording in Gerencia's catalog, much less for ~~the~~all of its Works. ~~Suno's training~~

~~8 data~~Suno's training-data practices constitute direct copyright infringement on a massive scale.

~~39~~45. While Suno claims to have put in guard rails to prevent output that is ~~similar to~~like existing artists, these guardrails are easily circumvented. For example, while the platform will not permit a user to include "Reba McEntire" in the prompt, it will allow users to include the prompt "in the style of Reba McIntyre [sic]" in creating a female-vocal country song in McEntire's style. Indeed, third party applications like "HookGenius" are advertising services to get around these guardrails by providing users ~~to generate~~ artist-specific prompts for Suno to generate entire albums based on the users' favorite ~~artists.[15]~~ artists.[20]

46. Further, despite previous protestations that Suno did not merely regurgitate pre-existing content and rejecting prompts that use artists' names, Suno V6 (the most recent version) now accepts these requests and "redirect[s]" them "toward descriptive musical characteristics" that Suno attributes to that artist.[21] That is, Mr. Shulman, Suno's CEO, is admitting that Suno was always designed to model after pre-existing works, but it was not until Suno concluded that its users wanted to use artist-specific prompts that it made the business decision to facilitate the creation of facsimiles of copyrighted works – including the Gerencia Works. Suno was just withholding this capability until it found a way to market it.

47. Further, V6 is trained from user-uploads without appropriate safeguards to prevent users from uploading copyrighted lyrics and music. For example, user uploads have been allowed since 2024[22] but Suno stated that copyrighted uploads would be blocked.[23] However, Suno announced new safeguards for audio and lyrics for V6.[24] The announcement of new safeguards is at least a tacit admission that the previous safeguards were not effective enough to prevent copyright infringement regarding output. The Suno terms and conditions grant Suno a "perpetual, irrevocable" license to train on all user-uploaded content.[25] As such, Suno is clearly training its models on user submissions, including copyrighted works and Gerencia's Works.

~~40~~48. Suno's platform generates lyrics based on user prompts or will accept user inputs.

[20] *See* https://hookgenius.app/learn/suno-eminem-style/ and https://hookgenius.app/pricing/

[21] Mikey Shulman, *How We're Building the Future of Music Responsibly*, Suno (Aug. 6, 2026) (available at https://suno.com/blog/building-the-future-of-music-responsibly (last visited Oct. 18, 2026)).

[22] https://suno.com/release-notes/audio-inputs-for-everyone (last visited Oct. 18, 2026).

[23] https://blog.suno.com/blog/audio-inputs (last visited Oct. 19, 2026).
[24] https://suno.com/blog/introducing-v6 (last visited Oct. 19, 2026).
[25] https://www.musicbusinessworldwide.com/suno-v6-ai-music-models-launch-in-partnership-with-wmg-bmg-and-believe/ (last visited Oct. 19, 2026).

While Suno's guardrails may sometimes prevent users from importing copyrighted lyrics in their entirety, these guardrails are easy to circumvent. For example, one of the Gerencia Works is entitled "15 Besos" as performed by Cornelio Vega y Su Dinastia. While Suno would not create a ~~"~~'Norteño~~"~~' song where the Spanish lyrics for "15 Besos" were supplied, Suno did create a song in the Norteño style with the lyrics directly translated into English, generating the name "Quince Besos". "Quince" is Spanish for fifteen. Below are the original Spanish Lyrics compared with the English translation that Suno used to create "Quince Besos". While the lyrics were supplied by the user, Suno still generated a song in the same genre with substantial musical similarities including the generation of a male singing voice for the translated, derivative work lyrics.

~~[14] "Suno Generates Beautiful Songs with Oracle Cloud". www.youtube.com/watch?v=aKlIQiS8MLc~~
~~[15] *See* https://hookgenius.app/learn/suno-eminem-style/ and https://hookgenius.app/pricing/~~

**Original Spanish Lyrics:**
[Verse]
Mi vida volvió a la normalidad
Desde que por primera vez te vi
Tus fotos me obligaron a quererte
Esa boquita que tienes
No se ve en ninguna parte
Amo verte sonreír
He estado a punto de querer llorar
Por no poder tener cerca de mí
Tus ojos, que me dan calma al mirarte Ni la más fina obra de arte
Compite con tu belleza Mil gracias por existir

[Chorus]
15 Besos te daré
Cada minuto grabaré en tu piel
Ese recuerdo, disfrutaré ese momento
Recordarte que te quiero Y eres lo que había soñado
Exactamente para mí
…

~~15~~24

~~C. Bright Data's Conduct~~

**English Translation Used by Suno:**

[verse 1]
My life returned to normal
the moment I first
saw you.
Your photos made me fall
for you—that lovely mouth
of yours
is unlike any other;
I love seeing you
smile. I've come
close to tears,
unable to have you close to me—
your eyes, which bring me peace when I look at you.
Not even the finest work of art
can rival your beauty.
A thousand thanks for existing.

[Chorus]
I'll give you fifteen kisses
I'll etch that memory onto your skin, minute by minute
I'll savor that moment
Reminding you that I love you
And that you are exactly what I had dreamed of for myself

49. This is evidence that users can easily create unlicensed derivative works merely by submitting them themselves. And, under the terms of service, Suno can then take these user submissions and further train its models on them despite the guardrails.

50. Suno has thus structured its AI models to generate AI music designed to mirror the very copyrighted songs it trains on, for which the above and below alleged outputs are but a few examples. Suno has thereby created AI models that deliver outputs which are substantially similar to Gerencia's Works. Indeed, independent sources have repeatedly identified instances where Suno's outputs are not merely in the style of existing works but contain verbatim or near-verbatim excerpts of pre-existing songs, including outputs that imitate the voices of the artists performing on those

~~17 41. Bright Data is a commercial vendor of web-scraping infrastructure whose business model is built on enabling customers to extract data from websites at scale—including websites that employ technical measures to prevent exactly that kind of bulk automated extraction. Bright Data's product suite includes residential and datacenter proxy networks that rotate IP addresses to evade rate limits and IP bans; a "Web Unlocker" service designed to defeat CAPTCHAs, JavaScript challenges, and bot-detection systems; and a "Scraping Browser" that renders pages in a browser environment without the headers and footers to circumvent client-side protections.~~

~~42. As discussed above, CMI regularly exists in the headers and footers. Making the deliberate choice to exclude headers and footers is identical to making the deliberate choice to remove 26 CMI~~songs.

51. These outputs include reproductions of melodies, lyrics, instrumentals, and even full passages indistinguishable from the originals. For example, Suno has output 'producer tags' which

are an integral musical part of songs throughout the hip-hop and rap genres, and function as a type of signature for a producer.

~~43. These products exist principally to defeat the access-control technologies that websites deploy to prevent unauthorized automated data extraction. Their commercial value lies precisely in their capacity to circumvent such controls. Bright Data markets these capabilities openly, advertising its ability to bypass anti-scraping defenses and deliver data from otherwise inaccessible sources.~~

~~44~~52. Upon information and belief, ~~Bright Data's tools and services were used — either by~~Suno claims that its AI models can produce "radio- ~~Bright Data itself on behalf of its customer, Suno or by Suno itself—to extract Gerencia's copyrighted Works from licensed streaming and lyrics platforms. This extraction required circumventing the technological protection measures those platforms employ: authentication gates, subscription paywalls, rate limiting, CAPTCHA challenges, and robots.txt access restrictions, as well as removal~~ quality music," and has encouraged users to post their outputs to "platforms expressly designed to commercialize music."[26] Suno thus not only ingested Gerencia's Works into its AI models to train them, but also with the explicit purpose of imitating the expressive features of the Works in digital music files that serve as substitutes for and compete with the original Works.

53. In GEMA's case against Suno mentioned above, GEMA's lawyers were able to reproduce songs like "Daddy Cool" by Boney M. and "Mambo No. 5" almost note for note by prompting Suno with the lyrics, a style, and a title.[27]

54. Plaintiffs in other cases have identified other examples of Suno's generation of outputs which infringe other's musical copyrights. For example, Plaintiffs in *UMG Recordings, Inc. et al. v. Suno, Inc.*, No. 1:24-cv-11811 (D. Mass. June 24, 2024), ECF 1 (the "UMG Complaint"), at pp. 16-18, alleged that Suno's AI model generated music indistinguishable from Chuck Berry's classic "Johnny B. Goode" song, not just once, but twenty-seven (27) times. These Suno generated outputs appear to copy the essential and immediately recognizable melodies and arrangements of the original

[26] UMG Recordings, Inc. et al v. Suno, Inc., et al., Case No. 1:24-cv-11611-FDS, DKT 277, at p. 27, ¶ 74 (D. Mass Aug. 25, 2026).

[27] Virginie Berger, Suno Loses Copyright Lawsuit To GEMA—AI Music Companies Should Worry, Forbes (Aug. 5, 2026), https://www.forbes.com/sites/virginieberger/2026/08/05/suno-lost-to-gema-why-the-ruling-should-worry-ai-music-companies/.

song.

55. The UMG Complaint also alleges that Suno's AI model generated ten (10) different outputs that resemble Bill Haley & His Comets' song "Rock Around the Clock." The Suno output contains four (4) lines at the beginning that are very similar to the original, with identical pitches and rhythm in many places. It also uses a melody later in the output on the phrase, "we're gonna rock around the clock tonight," which is virtually identical to the melody of the original. *Id.*, Paragraph 56 8 of CMIat 19.

56. The UMG Complaint further alleges Suno generated a song similar to Jerry Lee Lewis' song, "Great Balls of Fire," including ten (10) different outputs that contain a famous melody in this song. One such output includes the recognizable characteristic large vocal leap up to the word "great" in the line, "goodness, gracious, great balls of fire." This line also replicated the rhythm of the original and follows a similar melodic shape. *Id.*, Paragraph 59 at 21.

57. Suno's AI model also generated six (6) different outputs that contain portions of B.B. King's famous song, "The Thrill is Gone." The first phrase in the output, "the thrill is gone," uses identical pitches to those used in the third occurrence of this phrase in the original sound recording. The second phrase, "the thrill has gone away," is also very similar to the same phrase in the original. *Id.*, Paragraphs 60-61, at pp. 21-22.

58. Suno's AI model also generated eleven (11) additional outputs resembling "Sway." *Id.*, Paragraph 61 at p. 22.

59. Indeed, Suno has claimed that over 10 million people have already created digital music files using its AI services as of 2024.[28]

60. As of November 2025, Suno users were generating about 7 million songs per day, and as of February 26, 2026, as mentioned above, Shulman claimed that more than 100 million people have used Suno, and that it has over 2 million paid subscribers and $300 million in annual revenue.[29]

9 45. Upon information and belief, Bright Data supplied the resulting scraped data — or thethese digital music files have been released to the public, including on

[28] Mikey Shulman, Suno Has Raised $125 Million to Build a Future Where Anyone Can Make Music, Suno Blog (May 21, 2024), https://suno.com/blog/fundraising-announcements-may-2024.
[29] https://www.forbes.com/sites/conormurray/2026/02/26/ai-music-platform-suno-reaches-2-million-subscribers-as-industry-backlash-grows/.

major streaming services, and thus compete with the copyrighted sound recordings that enabled their

creation for which Suno did not seek or obtain permission to use. Moreover, and upon information and belief, discovery will undoubtedly show that Suno created additional outputs which infringe upon all of Gerencia's Works, and are either verbatim copies, strikingly similar or substantially similar.

~~tools to generate it—to Suno with knowledge that the data consisted of copyrighted material and would be used to train commercial AI models without authorization from the copyright holders. Bright Data's awareness of this end use is inferred from the nature of its customer relationships with AI development companies, the public prominence of the AI training-data debate since at least 2023, and the widespread litigation over unauthorized AI training on copyrighted content.~~

~~46. Bright Data's role in Suno's unlawful copyright infringement was not publicly known until a data hack and public release showed that Suno used Bright Data's tools to scrape the internet which was reported first by 404 Media on July 15, 2026.[16]~~

### ~~D~~C. Harm to Gerencia

~~47. Defendants'~~61. Defendant's unlawful infringing conduct has caused and continues to cause harm ~~Gerencia~~to Gerencia and the songwriters and artists it represents (and/or whose works it owns).

~~48~~62. The Gerencia Works are world-famous pieces of music in the Regional Mexican and Latin genres—the very kind of artistic expressions that the Copyright Act is designed to protect in fulfillment of the Constitutional mandate.

~~49~~63. Without a single penny of remuneration—much less even a request for license—~~Defendants'~~Defendant Suno, a massive, for-profit ~~companies have~~company has engaged in rampant commercial copying, unauthorized access, and removal of CMI. This has harmed Gerencia by, *inter alia*, devaluing ~~its catalog,~~ catalog, diverting compensation away from Gerencia, precluding licensing opportunities, and ~~divesting~~by divesting Gerencia's commercial control over these Works. In short, it infringes upon just about every one of Gerencia's exclusive rights as the copyright owner of the Works.

~~50~~64. Meanwhile, ~~Defendants have~~Defendant has amassed ~~massive fortunes~~a fortune by circumventing the protections

~~[16] https://www.404media.co/hack-reveals-suno-ai-music-generator-scraped-youtube-deezer-and-genius/~~

~~4 protections~~ afforded to Gerencia by the Copyright Act. Without the use of works such as those owned, controlled, ~~5 controlled,~~ or represented by Gerencia, ~~Defendant~~ Suno would have no business.

~~6 51.~~ ~~While~~65. Thus, while simultaneously holding ~~themselves~~itself out to be an "~~ethical" companies~~responsible" company, Suno ~~has~~ ~~7~~ has been knowingly and intentionally committing willful copyright infringement from inception of ~~its AI~~ ~~8~~ its AI models~~, and Bright Data knowingly provided them tools to commit this infringing conduct~~.

**~~9~~ ~~E~~D. Fair Use Does Not Apply**

~~10 52~~66. As this Court in *Bartz v. Anthropic PBC*, 787 F. Supp. 3d. 1007, 1030-34 (N.D. Cal. June 23, 2025) ("*Bartz I*") determined following discovery, the practice of indefinite retention in a ~~12~~ general-purpose archive is legally distinct from the narrower act of purchasing and scanning works ~~13~~ solely to train a specific model. Suno has engaged in the ~~exact~~ same conduct~~:~~, and the indefinite retention ~~14~~ of unlicensed copies of copyrighted works, under *Bartz I*, does not constitute fair use. Building and ~~15~~ maintaining a permanent stockpile of copyrighted material for open-ended future exploitation fails ~~16~~ every factor of the fair-use analysis: the purpose is acquisitive rather than transformative; entire works ~~17~~ are retained without limitation; and the unauthorized copies function as market substitutes, displacing ~~18~~ sales and licenses on a one-to-one basis. This Court did not mince words when it rejected any ~~19~~ suggestion that the Copyright Act contains a technology-sector exception to these well-established ~~20~~ principles. *Id.* at 1022 ("Anthropic [another AI company] seems to believe that because some of the works it copied were sometimes used in training LLMs~~,~~,[30] Anthropic was entitled to take for free all ~~the works in the~~ ~~22~~ the works in the world and keep them forever with no further accounting. **There is no carveout, however, from the Copyright Act for AI companies.**") (emphasis added).[17]

~~24 53~~67. While in other cases for copyright infringement, ~~Defendants have~~Suno has waxed poetic about the ~~25 the~~ necessity of progress and AI's value to society, there is simply no reason—other than ~~rote~~expediency— ~~26 expediency—~~ to have that progress come at the cost of copyrights holders. Indeed, even if, accepting

*arguendo*, the

~~[17] An LLM, or "Large Language Model," is a type of artificial intelligence program trained on massive amounts of text to recognize, translate, summarize, and generate human-like language.~~

~~*arguendo*, the~~ procedural hurdles for ensuring proper licensing for the size of data needed for an effective AI ~~Model,~~ model, there exists an entire universe of public domain and non-copyrighted materials with which to train ~~to train~~ the models. For example, literally every (formerly) copyrighted work under U.S. Copyright law ~~law~~ written before 1931 (1926 for sound recordings) has now entered the public domain.

~~54~~68. Furthermore, these "expediency" arguments completely falter when compared to the $5.4 billion valuation that ~~the~~ Suno has garnered exploiting illicit copies of copyrighted works, including ~~including~~ the Gerencia Works. The Works were created over many years, and Suno, by its infringing conduct, ~~conduct,~~ is destroying the value of these works in a matter of a few years with only profit as its motive. By ~~motive. And~~comparison, there are AI companies and collective rights organizations who ~~actually~~ seek permission and pay ~~and pay~~ rights holders to create data sets for AI training. Such companies include ElevenLabs, Musical AI, Symphonic, Soundverse, GEMA (through PLAI), GCX/Rightsify, and Troveo. Not only does this ~~does this further undercut any claim that this is anything other than the greatest heist in human history,~~ ~~it~~further undercut any "expediency" arguments, but it also directly demonstrates the harm Gerencia faces to license with these forthright entities that license and pay for use of copyrighted music.

~~55~~69. And, of course, "Fair use presupposes good faith and fair dealing." *Harper & Row*

[30] An LLM, or "Large Language Model," is a type of artificial intelligence program trained on massive amounts of text to recognize, translate, summarize, and generate human-like language.

*Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 540 (1985). Just as in *Harper & Row*, the copying ~~and permanent retention~~ of the Gerencia Works (in addition to the millions of other copyrighted works) was not the "incidental effect but the *intended purpose*." *Id.* (emphasis kept). Worse, the illicit

copying, removal of CMI, and permanent retention of these copyrighted works *for the purpose* of regurgitating infringing copies thereof or to create songs to directly compete falls well outside of the enumerated fair use activities set forth in the Copyright Act, 17 U.S.C. ~~§~~section 107. There is simply~~-nothing~~ nothing fair about a company using theft to build for purely commercial purposes a multi-billion~~-dollar~~- dollar business while those from which they steal receive nothing.

70. The Third Circuit held this to be true in *Thomson Reuters Enter. Ctr. GmbH v. ROSS Intel. Inc.*, No. 25-2153, 2026 WL 2932557 (3d Cir. Sept. 29, 2026). Analyzing the four fair use factors, the court explained that the legal research company ROSS's taking of information conglomerate and legal research engine Reuters' copyrighted materials to train its AI on how to be responsive to user's questions, as well as to compete with the product it was stealing from, was not fair use. This "is the same same-purpose reasoning" as that in *GEMA v. Suno*, where the Munich Regional Court "assessed the US fair use position on training carried out in the US and rejected it, finding that outputs served the same purposes as the originals rather than a new one, and that the use was commercial."[31]

## VI. CAUSES OF ACTION

### FIRST CAUSE OF ACTION – DIRECT COPYRIGHT INFRINGEMENT

~~(AGAINST SUNO)~~

~~56~~71. Gerencia re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs as if set forth fully herein.

~~57~~72. Gerencia owns or exclusively controls valid, subsisting copyrights in the ~~musical~~Works ~~compositions~~ identified in Exhibit A~~ and in numerous additional works~~.

~~58~~73. Suno, without authorization from Gerencia, reproduced Gerencia's copyrighted ~~compositions~~Works identified in Exhibit A by: (a) scraping or otherwise obtaining copies from licensed streaming~~ platforms and~~ platforms and other online sources, including through the use of circumvention tools and services ~~provided by~~27

[31] https://www.musicbusinessworldwide.com/a-us-appeals-court-has-rejected-a-fair-use-defense-over-ai-training-what-does-it-mean-for-the-labels-fight-with-suno/.

provided by Bright Data; (b) assembling those copies into training datasets; (c) ~~unlawfully reproduced the musical~~storing and reproducing those copies, including server copies in a permanent, all-purpose internal repository maintained for indefinite reproductions for future use; (d) unlawfully reproducing the musical compositions at issue here through the making of permanent server copies; and (~~d~~e) processing those datasets through its model-training pipeline. Each such act independently ~~violates~~violated Gerencia's exclusive rights under 17 U.S.C. ~~§§~~sections 106(1) and 106(2).

~~59~~74. None of these acts qualifies as a fair use. As the *Bartz I* court held, the indefinite retention of copyrighted works in a general-purpose repository for uncommitted future exploitation is not transformative and fails every factor of the fair-use test. The same reasoning applies to Suno's ~~and Bright Data's~~ accumulation of copyrighted recordings for AI training at commercial scale without any license or compensating benefit to rights holders.

~~60~~75. Defendant's infringement in these regards was willful. At all times relevant to this Complaint, ~~Defendants~~Defendant had actual knowledge that ~~they were~~it was making copies of Gerencia's Works without license or payment.

~~61~~76. Suno, without authorization from Gerencia, has infringed and continues to infringe Gerencia's Works identified in Exhibit A each time Suno's AI music generator reproduces, displays, performs, or prepares a derivative work based upon Gerencia's copyrighted Exhibit A Works. These infringing outputs include songs created in response to user prompts that are substantially similar, if not strikingly similar to, the Gerencia Works identified in Exhibit A, and unlicensed derivative works that incorporate, without a license, the original,

~~23~~ copyrighted elements of the Gerencia Works~~.~~ identified in Exhibit A.

~~24 62~~77. Suno's leaked code shows that it deliberately ~~endeavored it~~enabled "stem splitting" *i.e.* breaking up ~~25 breaking up~~ sound recordings of musical compositions into separate tracks for vocals, drums, and the various ~~26 various~~ instruments played. Further, Suno purportedly additionally deliberately sought out *a cappella* ~~27~~ versions of the songs so that it could more faithfully create vocals based upon the infringed Works ~~28~~ and further train its AI model on multiple iterations of the musical composition, especially with regard ~~1~~ to the lyrics of the song so that its model could "create" (*i.e.* regurgitate infringing derivative works) ~~2~~ lyrics based thereupon.

78. In addition to using "stem splitting," Suno also used a training code that uses related recordings together. The Suno code puts a cover recording followed by the "main" (original) recording of the same song when creating ~~a~~ training data instance. That gives the Suno model the cover as reference audio while it learns to predict the main recording. In this manner, Suno uses multiple versions of a song during its AI model training. This could be used, for example, to take a copyrighted acoustic performance scraped from the internet by Suno without permission and generate a full-band version or turn a ballad into a dance track.

~~3 63~~79. Each infringing output by Suno constitutes an independent violation of Gerencia's ~~4~~ exclusive rights to reproduce (~~§~~section 106(1)), prepare derivative works (~~§~~section 106(2)), distribute ~~copies (§~~ ~~5~~ copies (section 106(3)), publicly perform (~~§~~section 106(4), and publicly display (~~§~~section 106(5) its copyrighted Works.

~~6 64~~80. Suno's output-stage infringement is willful. While Suno advertises that it enacted ~~7~~ safeguards to prevent copying of copyrighted elements, these safeguards are easily overcome.

~~8 65~~81. Gerencia has been damaged by Defendant Suno's infringement and is entitled to ~~9~~ recover actual damages and Defendant Suno's profits under 17 U.S.C. ~~§~~section 504(b), or in the ~~alternative,~~ ~~10~~ alternative, statutory damages of up to $150,000 per ~~work~~Work willfully infringed under 17 U.S.C. ~~§ 504(c). The total~~section ~~11~~ 504(c). Gerencia identifies 444 Works on Exhibit A, meaning that the total statutory damages sought

in this case for Defendant Suno's infringement of its 444 Works (listed on 12 Exhibit A) equalsin this case is $66,600,000.00.

13 **SECOND CAUSE OF ACTION** CONTRIBUTORY COPYRIGHT INFRINGEMENT (AGAINST DEFENDANT BRIGHT DATA)

66. Gerencia re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs as if set forth fully herein.

67. Suno's unauthorized reproduction of Gerencia's copyrighted works for AI training, as alleged in Count I, constitutes direct infringement of Gerencia's copyrights in the Works listed in Exhibit A, incorporated by reference.

68. Bright Data had knowledge—actual or constructive—of Suno's direct infringement of the Exhibit A Works. Bright Data knew or had reason to know that: (a) the recordings and lyrics it scraped from streaming platforms and lyrics sites were protected by copyright; (b) its extraction of those works was unauthorized; and (c) the resulting copies were being supplied to, or used by, Suno to train a commercial AI music generator without any license from the copyright owners. Bright Data's knowledge is inferable from the public notoriety of AI-training copyright disputes since at least 2023, including extensive media coverage and multiple filed lawsuits.

69. Bright Data materially contributed to Suno's infringement by: (a) providing the scraping tools and proxy infrastructure that enabled Suno to obtain unauthorized copies at the necessary scale; (b) directly scraping copyrighted works and assembling them into datasets supplied to Suno; and/or (c) offering circumvention services that defeated the access controls preventing Suno from copying the works on its own. Absent Bright Data's contribution, Suno could not have assembled its training corpus with comparable speed, breadth, or efficiency. §

70. The standard for contributory liability in this Circuit is well established: a party that knows of another's infringement and materially contributes to it—or that has the ability to take straightforward steps to prevent continuing infringement yet fails to do so—is contributorily liable. *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1172 (9th Cir. 2007) (citing *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1022 (9th Cir. 2001)); *see also Concord Music Group, Inc. v. Anthropic PBC*, No. 24-cv-03811-EKL (N.D. Cal. Oct. 6, 2025) (denying motion to dismiss contributory infringement claim under this standard).

~~71. Bright Data's contributory infringement was willful.~~

~~72. Gerencia has been damaged by Bright Data's contributory infringement and is entitled to compensatory damages and Bright Data's profits under 17 U.S.C. § 504(b), or in the alternative, statutory damages of up to $150,000 per work willfully infringed under 17 U.S.C. § 504(c). There are 444 Works on Exhibit A, for a total of $66,600,000.~~

~~THIRD CAUSE OF ACTION~~ CIRCUMVENTION OF PROTECTION MEASURES, 17 U.S.C. § 1201

~~(AGAINST ALL DEFENDANTS)~~

~~73~~82. Gerencia re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs as if set forth fully herein.

~~74~~83. Gerencia's copyrighted Works listed in Exhibits A and B are hosted on licensed streaming and lyrics platforms that deploy technological measures to control access to those works. These measures include, without limitation: user-authentication requirements (login credentials and session tokens); paid-subscription paywalls; CAPTCHA and bot-detection challenges; IP-based rate limiting; JavaScript rendering requirements; and Terms of Service and robots.txt directives restricting automated access. These measures effectively control access to Gerencia's copyrighted works within the meaning of 17 U.S.C. ~~§~~section 1201(a)(3)(B).

§

~~75. Bright Data violated 17 U.S.C. § 1201(a)(2) by manufacturing, offering, providing, and trafficking in technology, services, and devices — including its Web Unlocker, proxy networks, and scraping infrastructure — that are primarily designed to circumvent the technological protection measures described above, that have only limited commercially significant use apart from such circumvention, and that are marketed for use in circumventing such measures.~~

~~76. Bright Data further violated 17 U.S.C. § 1201(a)(1) by itself circumventing, or by directing the circumvention of, these access controls in the course of scraping Gerencia's copyrighted works from the platforms on which they are hosted.~~

~~77~~84. Suno violated 17 U.S.C. ~~§~~section 1201(a)(1) by circumventing—directly ~~or~~and through ~~the use~~ the use of Bright Data's tools and services—technological measures that effectively controlled access ~~to~~ to Gerencia's copyrighted ~~works~~Works on licensed streaming and lyrics platforms, thereby obtaining

unauthorized access to and copies of those ~~works~~Works for use in training its AI model.

~~78.~~ ~~Defendants'~~85. Defendant's violations of ~~§~~section 1201 were willful and conducted for commercial advantage and financial gain.

~~79~~86. Gerencia has been damaged by ~~Defendants'~~Defendant's violations and is entitled to remedies under 17 U.S.C. ~~§~~section 1203, including injunctive relief, actual damages or statutory damages of up ~~to~~ to $2,500 per violation under ~~§~~section 1203(c)(3)(A), costs, and attorneys' fees. There are 444 Works ~~on~~ on Exhibit A and 730 Works on Exhibit B for a total of 1,174 Works for a total of $2,935,000.

## ~~FOURTH~~THIRD CAUSE OF ACTION – REMOVAL OR ALTERATION OF CMI, 17 U.S.C. § 1202

~~(AGAINST ALL DEFENDANTS)~~

~~80~~87. Gerencia re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs as if set forth fully herein.

~~81~~88. Gerencia's copyrighted Works listed in Exhibits A and B, as displayed on licensed lyrics platforms and streaming services, bear copyright management information within the meaning of 17 U.S.C. ~~§~~section 1202(c), including: the title of the composition; the identity of the songwriter(s) ~~and/or~~ and/or composer(s); the identity of the copyright owner and/or publisher (Gerencia); and other ~~identifying~~ identifying data such as ISRC codes and copyright notices.

~~82.~~ ~~Defendants~~89. Defendant intentionally removed or altered CMI from Gerencia's copyrighted Works listed in Exhibits A and B~~,~~ during its data-cleaning pipeline, in violation of 17 U.S.C. ~~§~~ section 1202(b)(1).

Upon information and belief, ~~Defendants'~~Defendant's engineers selected a data-extraction ~~methodology that~~ methodology that aggressively stripped authorship and ownership metadata, choosing it over available alternatives that would have preserved that information.

~~would have preserved that information. Defendants further distributed copies of Gerencia's Works with CMI removed through Suno's outputs, in violation of 17 U.S.C. § 1202(b)(3).~~

~~83. Defendants~~90. Defendant knew, or had reasonable grounds to know, that ~~its removal and omission~~CMI is vital to protecting Gerencia's copyright interests and that its removal and omission of CMI would induce, enable, facilitate, or conceal infringement. Suno was aware that its AI models memorize the training-data ~~tend to memorize and reproduce training-data~~ content. It follows that stripping CMI during training would conceal Suno's infringement. This ~~would ensure that Suno would not attribute its lyric outputs to their true authors—concealing Suno's own infringement and facilitating further infringement by users who receive copyrighted lyrics without any indication of their protected status. This satisfies the "double scienter" requirement~~ satisfies the "double scienter" requirement established in *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 671, 673 (9th Cir. 2018); *see Concord Music Group, Inc. v. Anthropic PBC*, No. 5:24-cv-03811-EKL, 2025 WL 4808984 *~~5~~4-5 (N.D. Cal. Oct. 6, 2025) (holding similar allegations sufficient at the pleading stage, citing *Kadrey v. Meta Platforms, Inc.*, 2025 WL 744032 (N.D. Cal. Mar. 7, 2025), and *Mango v. BuzzFeed, Inc.*, 970 F.3d 167, 173 (2d Cir. 2020)).

~~84. Bright Data intentionally removed or altered CMI from Gerencia's Works during the scraping and data-assembly process, in violation of 17 U.S.C. § 1202(b)(1). Upon information and belief, Bright Data's extraction tools stripped or discarded the authorship and ownership metadata that accompanied Gerencia's lyrics and recordings on the source platforms. Bright Data further distributed copies of Gerencia's Works with CMI removed by supplying scraped datasets to AI developers including Suno, in violation of 17 U.S.C. § 1202(b)(3). Bright Data knew or had reasonable grounds to know that distributing stripped-down copies of copyrighted works to AI training operations would facilitate large-scale infringement.~~

~~85. Defendants'~~91. Defendant's violations of ~~§~~section 1202 were willful and conducted for commercial advantage.

~~86~~92. Gerencia has been damaged by ~~Defendants'~~Defendant's violations and is entitled to remedies under 17 U.S.C. ~~§~~section 1203, including injunctive relief, actual damages or statutory damages of up~~ to~~ to $25,000 per violation under ~~§~~section 1203(c)(3)(B), costs, and attorneys' fees. There are 444 Works~~ on~~ on Exhibit A and 730 Works on Exhibit B for a total of 1,174 Works for a total of $29,350,000.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Gerencia 360 Music, Inc. respectfully requests that this Court enter judgment against ~~Defendants~~Defendant Suno and grant the following relief:

(a) A declaration that ~~Defendants have~~Defendant has willfully infringed Gerencia's copyrighted Works~~ listed in~~ listed in Exhibit A in violation of 17 U.S.C. ~~§§~~sections 106 and 501;

(b) A declaration that ~~Defendants have~~Defendant has violated 17 U.S.C. ~~§ 1201~~section1201 by circumventing,~~ and~~ and by trafficking in tools designed to circumvent, technological measures effectively controlling~~ access~~ access to Gerencia's copyrighted Works listed in Exhibits A and B;

(c) A declaration that ~~Defendants have~~Defendant has violated 17 U.S.C. ~~§~~section 1202 by intentionally removing or altering copyright management information from Gerencia's Works listed in Exhibits~~ A~~ A and B and distributing copies with such information removed, with knowledge or reasonable~~ grounds~~ grounds to know that doing so would induce, enable, facilitate, or conceal infringement;

(d) A permanent injunction prohibiting ~~Defendants~~Defendant, and ~~their~~its officers, agents, employees, successors, and assigns, from further infringing Gerencia's copyrights or engaging in any of the unlawful conduct alleged herein;

(e) An order directing ~~Defendants~~Defendant to deliver for impoundment or destruction all unauthorized copies of Gerencia's copyrighted Works in ~~their~~its possession, custody, or control—including copies retained in training datasets, internal repositories, model weights, and server infrastructure—pursuant to 17 U.S.C. ~~§~~section 503(b);

21 (f) An order requiring DefendantsDefendant to provide a complete accounting of all training data,

22 scraping activities, and datasets involving Gerencia's copyrighted Works;

23 (g) An award of actual damages suffered by Gerencia and disgorgement of Defendants'Defendant's

24 profits attributable to the infringement, pursuant to 17 U.S.C. §section 504(b); or, in the alternative, an award

25 an award of statutory damages of up to $150,000 per work Work for each of the 444 Works listed in Exhibit A, willfully infringed, pursuant to 17 U.S.C. §section 504(c);, which amounts to $66,600,000.00;

26 (h) An award of actual damages or statutory damages of up to $2,500 per violation of

27 17 U.S.C. §section 1201 and up to $25,000 per violation of §section 1202, pursuant to 17 U.S.C. § section 1203(c); 28

1 (i) An award of Gerencia's reasonable attorneys' fees and costs of suit, pursuant to

2 17 U.S.C. §§sections 505 and 1203(b)(4)-(5);

3 (j) Pre-judgment and post-judgment interest at the maximum lawful rate; and

4 (k) Such other and further relief as this Court deems just and equitable.

5

## 6 DEMAND FOR JURY TRIAL

7 Plaintiff Gerencia 360 Music, Inc. demands a trial by jury on all issues so triable, pursuant to

8 to Federal Rule of Civil Procedure 38(b).

9 Dated: August 31October 19, 2026

*/s/ Richard S. Busch*

10 ADAMS & REESEADAMS & REESE, LLP

Richard S. Busch (SBN 319881)
Mark L. Block (SBN 115457)
Andrew H. "Drew" Davis (pro hac vice forthcoming)
David Niemierzycki (pro hac vice forthcoming)
1600 West End Ave., Suite 1400
Nashville, TN 37203
Tel: (615) 259-1450
Fax: (615) 259-1470
*richard.busch@arlaw.com*
*mark.block@arlaw.com*
*drew.davis@arlaw.com*
*david.niemierzycki@arlaw.com*

**SKAGGS FAUCETTE LLP**
Jeffrey E. Faucette (SBN 193066)
Martin R. Glick (SBN 40187)
505 Montgomery Street, 11th Floor
San Francisco CA 94111
Tel: (415) 874-3181
Fax: (888) 980- 6547
*jeff@skaggsfaucette.com*
*marty@skaggsfaucette.com*

*Attorneys for Plaintiff Gerencia 360 Music, Inc.*

~~FILER S ATTESTATION~~

~~I, Richard S. Busch, am the ECF user whose identification and password are being used to file the foregoing document. In compliance with Local Rule 5-1(i)(3), I hereby attest that all signatories hereto concur in this filing.~~

~~*/s/ Richard S. Busch*~~

| **Summary report:** **Litera Compare Cloud 11.17.0.149 Document comparison done on 10/20/2026 12:47:13 AM** | |
|---|---|
| **Style name:** Standard | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** 1. Gerencia Complaint 2.pdf | |
| **Modified filename:** Gerencia v. Suno - 26-cv-09248 - Amended Complaint for Filing.pdf | |
| **Changes:** | |
| Add | 1435 |
| ~~Delete~~ | 1174 |
| ~~Move From~~ | 37 |
| Move To | 37 |
| Table Insert | 0 |
| ~~Table Delete~~ | 0 |
| Table moves to | 0 |
| ~~Table moves from~~ | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 2683 |